AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Two hotel rooms, two vehicles, and two bags<br>in SeaTac, more fully described in Attachment A | )<br>)<br>)<br>)<br>)<br>)    Case No.   MJ20-518 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A, incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution/Possession with Intent to Distribute Controlled Substances |
| 18 U.S.C. § 924(c) | Possession of a Firearm in Furtherance of a Drug Trafficking Crime |

The application is based on these facts:

✓ See Affidavit of SA Eric Jackson, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Eric Jackson, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: _____ 08/11/2020 _____

_____
*Judge's signature*

City and state:  Seattle, Washington

Hon. Mary Alice Theiler, United States Magistrate Judge
*Printed name and title*

1                               **AFFIDAVIT**

2    STATE OF WASHINGTON     )

                                   )    ss

3    COUNTY OF KING              )

4

5    I, Eric Jackson, being first duly sworn, hereby depose and state as follows:

6                     **INTRODUCTION AND AGENT BACKGROUND**

7          1.      I am an "investigative or law enforcement officer of the United States" within

8 the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the

9 United States who is empowered by law to conduct investigations of, and to make arrests

10 for, offenses enumerated in Title 18, United States Code, Section 2516.

11          2.      I am a Special Agent with the United States Department of Justice (DOJ),

12 Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and have been so employed

13 since January 11, 2015.  I am currently assigned to the Seattle Field Division in Seattle,

14 Washington where I am assigned to the Seattle I Field Office.  In this capacity, I enforce

15 federal criminal laws relating to the unlawful possession, use and trafficking of firearms.

16 I also investigate individuals who illegally use firearms to commit violent crimes.  Prior to

17 my employment with ATF, I served as a Police Officer/Detective with the Dekalb County

18 Police Department in Georgia from November 2001 until January 2015.

19          3.      For the last four years that I was employed with the Dekalb County Police

20 Department, I was assigned full time to the Federal Bureau of Investigation (FBI), Atlanta

21 Field Office, Safe Streets Gang Task Force (SSGTF) in which I was deputized as a Special

22 Federal Officer and investigated federal organized crime violations.  I received formal

23 training in the Federal Law Enforcement Training Center in Glynco, Georgia, Criminal

24 Investigators Training Program, which familiarized me with basic narcotic investigations,

25 drug identification and detection, familiarization with United States narcotics laws,

26 financial investigations and money laundering, identification and seizure of drug-related

27

28    AFFIDAVIT OF SA ERIC JACKSON                 UNITED STATES ATTORNEY
     USAO No. 2020R00604 - 1                          700 STEWART STREET, SUITE 5220
                                             SEATTLE, WASHINGTON 98101
                                                  (206) 553-7970

1  assets, organized crime investigations, physical and electronic surveillance, and

2  undercover operations.  In addition, I successfully completed a fourteen-week ATF Special

3  Agent Basic Training course in Glynco, Georgia, which included comprehensive,

4  formalized instruction in, among other things:  firearms identification, firearms trafficking,

5  arson and explosives, and tobacco and alcohol diversion.

6  **PURPOSE OF AFFIDAVIT**

7  4.  This Affidavit is submitted in support of an application to search the

8  following items and locations identified during the arrest of DAVID MANUEL

9  ROSARIO, as further described in Attachment A, attached hereto and incorporated by this

10  reference as if set forth fully herein:

11  • Two hotel rooms, #121 and #223, located at the Ramada Inn and Suites,

12  16720 International Boulevard, SeaTac, Washington (hereinafter, "**HOTEL**

13  **ROOMS 1 and 2**");

14  • Two bags, a black tote bag and a NorthFace backpack, seized from one of

15  ROSARIO's associates during ROSARIO's arrest, and now in ATF custody

16  at Ramada Inn and Suites, 16720 International Boulevard, SeaTac,

17  Washington;

18  • A gold Honda Civic with no license plates, located in the parking lot of the

19  Ramada Inn and Suites, 16720 International Boulevard, SeaTac, Washington

20  (hereinafter, "**TARGET VEHICLE 3**"); and

21  • A white Chevrolet Trailblazer bearing Washington license plate BFU4634

22  (hereinafter, "**TARGET VEHICLE 4**"), located in the parking lot of the

23  Ramada Inn and Suites, 16720 International Boulevard, SeaTac,

24  Washington.

25  5.  As set forth below, there is probable cause to believe that the items and

26  locations enumerated above contains evidence, fruits, and instrumentalities of the

27

28  AFFIDAVIT OF SA ERIC JACKSON
   USAO No. 2020R00604 - 2

1  following crimes:   distribution and possession with intent to distribute controlled

2  substances, and conspiracy to do the same, in violation of Title 21, United States Code,

3  Sections 841(a)(1) and 846, and possession of a firearm in furtherance of a drug trafficking

4  crime, in violation of Title 18, United States Code, Section 924(c), as further described in

5  Attachment B, attached hereto and incorporated by this reference as if set forth fully herein.

6          6.      The information set forth in this Affidavit consists of information I have

7  gathered and observed firsthand through the course of this investigation to date, as well as

8  information relayed to me by other law enforcement officers, my review of law

9  enforcement reports, and interviews of witnesses. Since this Affidavit is being submitted

10  for the limited purpose of obtaining a search warrant, I have not included every fact known

11  to me concerning this investigation. I have set forth only the facts that I believe are essential

12  to establish the necessary foundation for the issuance of such warrant.

13                              **SUMMARY OF PROBABLE CAUSE**

14          7.      In late May, 2020, federal investigators met with King County Sheriff's

15  Office (KCSO) Confidential Informant (CI) CIU-20-20 regarding a firearms

16  trafficker/narcotics trafficker by the name of "JUNE."

17          8.      The CI has juvenile felony convictions for crimes of dishonesty, specifically,

18  attempted burglary and theft of a motor vehicle. The CI was stopped by law enforcement

19  and found to be in possession of narcotics. He/she is assisting law enforcement in exchange

20  for law enforcement's agreement not to refer criminal charges arising out of that

21  investigation.

22          9.      On May 26, 2020, SA Jackson was able to use open source information and

23  law enforcement databases to identify "JUNE" as David Manuel ROSARIO. The CI was

24  shown a Washington Department of Licensing (DOL) photograph of ROSARIO. The CI

25  identified the photograph as the person he/she knows as "JUNE".

26

27

28  AFFIDAVIT OF SA ERIC JACKSON
    USAO No. 2020R00604 - 3

1     10.     SA Jackson checked ROSARIO's criminal history and saw he had several

2     narcotics related arrest in the past, but no convictions.

3     **Controlled Purchase of Methamphetamine, Heroin,**
      **and a Firearm on May 29, 2020**
4

5     11.     On May 28, 2020, investigators met with the CI for the purpose of the CI

6     setting up a controlled drug buy from ROSARIO. The CI was directed to set up a meeting

7     with ROSARIO so the CI could introduce an ATF Undercover (UC) Agent to potentially

8     purchase narcotics and firearms from ROSARIO. The CI was able to set up a meeting with

9     ROSARIO for the following afternoon.

10     12.     On May 29, 2020, all personnel from ATF, DEA and HSI that were

11     participating in the operation, held a briefing. During the briefing, photographs of

12     ROSARIO were shown to all participants.

13     13.     Following the briefing, all surveillance units set up in their assigned locations

14     around the Hawthorn Suites, located at 6329 South 212th Street in Kent, Washington. SA

15     Jackson, the UC, and TFO Eshom met with the CI at a predetermined location.

16     Surveillance units observed what was believed to be ROSARIO's white Cadillac Escalade,

17     bearing Washington license plate BQJ0871, parked in the parking lot of Hawthorn Suites

18     on the east side of the building. ROSARIO was also believed to have a black Chevrolet

19     Tahoe, which was not present.

20     14.     At approximately 1322 hours, SA Jackson, TFO Eshom and the UC spoke

21     with the CI at the staging location. SA Jackson directed the CI to call ROSARIO to confirm

22     he was ready to meet. The CI called ROSARIO at 206-257-9287, which was the primary

23     number he/she normally used to contact ROSARIO. ROSARIO advised he was ready to

24     meet and told the CI to come to his room at Hawthorn Suites in Kent. The CI knew

25     ROSARIO's room to be 1707 from a previous time he/she was there.

26

27

28     AFFIDAVIT OF SA ERIC JACKSON
       USAO No. 2020R00604 - 4

15.    SA Jackson searched the CI's vehicle for contraband.    There was no contraband located in the CI's vehicle.    TFO Eshom searched the CI's person for contraband.    There was no contraband on the CI's person.    SA Jackson outfitted the CI with an ATF covert recording device to record the deal.    SA Jackson provided the UC with $3,500 in ATF buy funds to purchase evidence.    The UC provided the CI with $1,000 of the buy funds to purchase 100 M-30 (suspected fentanyl) pills.    The plan was for the UC to purchase two to three ounces of methamphetamine and a couple of firearms.    The CI was supposed to purchase 100 M-30 (suspected fentanyl) pills.

16.    At approximately 1409 hours, the UC and CI walked to room 1707 (building R) and were let inside.    The UC stated ROSARIO was not initially in the room once they were let in.    The UC stated there was one female and three males inside of the location once they got there.    One of the females was said to be ROSARIO's girlfriend, whom was later identified as SR.    While inside, the UC observed two other white males in the location who were there to also purchase narcotics.    The UC observed a camera on the countertop of the kitchenette that was moving and scanning the room.    The UC was told by several of the individuals that ROSARIO was watching the room remotely.

17.    The UC observed ROSARIO enter the room approximately 30 minutes later and recognized him from the photographs reviewed earlier.    ROSARIO was carrying a backpack.    The UC and CI stepped out onto the suite's deck to allow ROSARIO to deal with the individuals who had arrived there before them.    Approximately five minutes later, the UC and CI walked back into the suite and began to deal with ROSARIO.    ROSARIO and the UC discussed a potential deal for one pound of methamphetamine for $4,000.    The UC and ROSARIO also discussed how difficult it was to get methamphetamine since the border was shut down.    The UC observed ROSARIO pull a pistol from his backpack and place it on the back of the couch he was standing next to.    ROSARIO then put the pistol

AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 5

1   back into the waistband of his shorts.   The UC's covert video caught the action of

2   ROSARIO removing the pistol from his shorts.

3        18.    The CI explained that the UC was trying to get some of the firearms shown

4   in a photograph that ROSARIO had texted the CI.  ROSARIO explained that he had already

5   sold them all, but got up and walked into the bedroom and returned with a silver Jennings,

6   J22, .22-caliber pistol.

7        19.    ROSARIO handed the firearm to the UC and explained, in sum, that he

8   would sell the firearm for $200.  The UC took the firearm and paid ROSARIO $200 for it.

9   ROSARIO sat down on the couch across from the UC, took his firearm out of his waistband

10  and placed it in between the cushions of the couch, in a place where only he would be able

11  to reach for it.

12       20.    The UC stated ROSARIO then produced from a small box, several pill

13  bottles containing what the UC understood to be Xanax bars and fentanyl pills.  ROSARIO

14  and the UC agreed on a deal for the UC to purchase 2 ounces of heroin for $800 and a half-

15  ounce of methamphetamine for $150.  ROSARIO then produced heroin from the box and

16  weighed out 2 ounces for which the UC paid him $1,600 in cash.  ROSARIO then produced

17  the one half ounce of methamphetamine and the UC gave ROSARIO $160 for it.

18  ROSARIO did not have a $10 bill to change so the UC paid $160 for the half ounce of

19  methamphetamine.

20       21.    The CI then dealt with ROSARIO, purchasing, what the UC understood to

21  be fentanyl and receiving some Xanax samples as well.

22       22.    During their deal, ROSARIO showed the UC a picture of an AR-15 with a

23  dual drum magazine, which he said, held 200 rounds.  ROSARIO explained, in sum, that

24  the firearm was his and that he would not part with it.

25       23.    At approximately 1535 hours, the UC and CI were seen leaving the room on

26  foot.  The UC and CI walked to the CI's car and got inside.

27

28  AFFIDAVIT OF SA ERIC JACKSON
    USAO No. 2020R00604 - 6

24.   At approximately 1536 hours, the UC and CI drove away from Hawthorn Suites. The UC and CI were followed by SA Jackson and TFO Eshom.

25.   SA Jackson and TFO Eshom met with the UC and CI at the staging location and debriefed them. The CI purchased what was supposed to be 100 M-30 pills for $1,000. The CI advised he/she owed ROSARIO money from a previous deal, so ROSARIO only gave him/her 75 pills and was planning to short him/her until the money they owed was made up. The CI also had two M-30 pills and a Xanax bar that he/she said ROSARIO gave him/her to sample. TFO Eshom took custody of the packaged M-30 pills along with the loose pills and Xanax bar the CI was given as a sample.

26.   SA Jackson took custody of the Jennings Firearms Incorporated, Model J22, .22 caliber pistol bearing serial number 025965.

27.   SA Jackson took custody of the recording device that was placed on the CI. It was later determined that the recording device malfunctioned and there was no recording on it, once a download was attempted. SA Jackson searched the CI's vehicle and the CI's person following the operation. There was no contraband found in the CI's vehicle or on the CI's person.

28.   TFO Eshom transported the Methamphetamine, Heroin, Xanax Bar and M-30 pills to KCSO where he weighed the evidence, field-tested, packaged it and placed it into evidence. The heroin weighed 53.5 grams (with packaging) and field-tested positive for heroin. The methamphetamine weighed 15.1 grams (with packaging) and field-tested positive for methamphetamine. The M-30 pills that were packaged were counted to be 75 pills. The pills were not field-tested due to being suspected fentanyl. The two loose M-30 pills and Xanax bar was also placed into KCSO evidence by TFO Eshom.

29.   SA Jackson transported the Jennings, P22 to the Seattle I Field Office where it was placed into the Seattle I Vault as evidence.

AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

30.     SA Jackson ran the firearm through NCIC and received "No Record", which means the firearm was not in the system as stolen.

**Controlled Purchase of Methamphetamine on June 8, 2020**

31.     On June 7, 2020, SA Jackson directed the CI to contact ROSARIO to set up another meet/deal for the following day. The CI contacted ROSARIO who agreed to meet the CI the following day for an M-30 deal.

32.     On June 8, 2020, at approximately 1208 hours, SA Jackson, SA Clammer and SA Hunt met with the CI at a predetermined location.

33.     The CI was directed to tell ROSARIO the UC obtained a lot of "looted" merchandise from the riots in the Seattle area.  The UC wanted ROSARIO to know they were willing to trade those items for firearms and narcotics as well as pay for firearms and narcotics.  The UC showed the CI the items that they were offering to trade.  The UC took photographs of the merchandise and sent it to the CI to send to ROSARIO.  The CI sent the photographs to ROSARIO.

34.     At approximately 1417 hours, the CI called ROSARIO at 206-257-9287. ROSARIO answered the phone and advised the CI they could meet.

35.     SA Jackson searched the CI's vehicle and the CI's person for contraband. There was no contraband located in the CI's vehicle or on the CI's person.  SA Jackson then outfitted the CI with a covert ATF transmitting/recording device to wear during the operation. SA Jackson provided the CI with $1,000 in Valley Narcotics Enforcement Team (VNET) buy funds to make the purchase of 100 M-30 (suspected fentanyl) pills.  It was anticipated that ROSARIO would short the CI as he did on the previous buy, since the CI was still in debt to ROSARIO.  Surveillance units set up around the meet location at 3rd Avenue South and South Holgate Street in Seattle.

36.     SA Jackson and SA Clammer followed the CI from the staging area to the meet location.  Once at the meet location, SA Jackson and SA Clammer allowed the

AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   surveillance units to take the primary view of the CI.   Surveillance units observed

2   ROSARIO's white Cadillac Escalade bearing Washington license plate BQJ0871,

3   ROSARIO's black Chevrolet Tahoe bearing Washington license plate BRU7532, and a

4   white Ford Explorer bearing Washington license plate 837XWX parked next to each other.

5   The CI pulled up next to the three vehicles, exited his/her vehicle and got into ROSARIO's

6   Escalade.

7       37.     The CI and ROSARIO had a conversation.  Following the conversation, the

8   CI provided ROSARIO the $1,000 in VNET buy funds and ROSARIO provided the CI

9   with 50 M-30 (suspected fentanyl) pills.  ROSARIO shorted the CI again due to the CI

10  being in debt to ROSARIO.  The CI advised ROSARIO the UC wanted to meet up with

11  him on that date.  ROSARIO stated he was ok with meeting the UC on that date.

12      38.     At approximately 1625 hours, the CI was observed getting back into his/her

13  vehicle and leaving the location.  SA Jackson and SA Clammer followed the CI away from

14  the location to a predetermined meet location.

15      39.     Once the CI made it back to the predetermined debrief area, SA Jackson

16  immediately took custody of the M-30 (suspected fentanyl) pills.  SA Jackson took custody

17  of the covert transmitting/recording device he placed on the CI.  SA Jackson searched the

18  CI's vehicle for contraband and searched the CI's person for contraband.  SA Jackson did

19  not locate any contraband in the CI's vehicle or on the CI's person.

20      40.     SA Jackson and ATF SA Jason Casel transported the pills to ATF Division

21  Office, weighed them in the packaging at 6.3 grams.  SA Jackson then counted the pills in

22  the presence of SA Casel, which came out to be 50 M-30 (suspected fentanyl) pills.  SA

23  Jackson did not field-test the pills due to them being suspected fentanyl.  SA Jackson placed

24  the evidence in the Seattle I Drug Safe to be secure and preserved until it was shipped to

25  the DEA Laboratory.

26

27

28  AFFIDAVIT OF SA ERIC JACKSON
    USAO No. 2020R00604 - 9

41.   SA Jackson downloaded the CI's audio onto a compact disc and placed into the Seattle I Evidence Vault.  SA Jackson listened to the audio and the audio is consistent with the CI's account of the deal. ATF SA Natalia Vorotnikova and HSI SA Michelle Hardin took photographs, which were placed onto a compact disc and attached to the report of investigation (ROI).

42.   Following the controlled purchase from ROSARIO, the CI placed another call to ROSARIO advising him that the UC was ready to meet him.  The CI called ROSARIO at 206-257-9287.  ROSARIO agreed to meet with the CI and the UC.  The CI was directed to have ROSARIO meet with them at the Olson-Meyers Park and Ride in Burien.

43.   SA Jackson, SA Clammer and the UC met with the CI at a predetermined location. SA Jackson searched the CI's vehicle for contraband and searched the CI's person for contraband.  There was no contraband located on the CI's person or in the CI's vehicle. SA Jackson outfitted the CI with an ATF covert transmitting/recording device to wear during the deal.

44.   At approximately 1750 hours, the UC and CI left the staging location.  The CI was driving his/her vehicle and the UC was driving his/her vehicle.  SA Jackson and SA Clammer followed the UC and CI to the meet location.

45.   At approximately 1806 hours, the UC and CI both arrived at the meet location and parked in the parking lot.

46.   At approximately 1925 hours, ROSARIO arrived in his white Cadillac Escalade bearing Washington license plate BQJ0871, followed by ROSARIO's black Chevrolet Tahoe bearing Washington license plate BRU7532.  The UC identified two males who were occupants of the Tahoe.

47.   ROSARIO exited his vehicle and walked immediately to the rear of the UC vehicle.  The UC showed ROSARIO the merchandise he/she had in the rear of the UC

AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  vehicle.  The UC provided the story to ROSARIO that the items were taken during

2  "looting" during the Seattle riots.

3      48.    ROSARIO advised he would accept trading narcotics for the merchandise

4  the UC had.  ROSARIO provided the UC one ounce of methamphetamine and $125 in cash

5  for the merchandise that was in the rear of the UC vehicle.  The merchandise consisted of

6  a flat screen television, liquor and a set of headphones.

7      49.    The UC spoke to ROSARIO about getting more firearms.  ROSARIO told

8  the UC he was going out that night to acquire more firearms.  ROSARIO stated he only

9  had one ounce of methamphetamine left.

10      50.    During the deal, ROSARIO made small talk over a recent drug deal in which

11  he had to pull his gun on a customer who was demanding too much for what he wanted to

12  pay.  While talking about their vehicles, ROSARIO stated, in sum, that one of the vehicles

13  was registered to one of the individuals in the Chevy Tahoe was clean.  While they

14  conducted their deal, the two males in the Tahoe conversed with the CI and the UC, but

15  never got out of the Tahoe, staying in it while surveilling the parking lot.

16      51.    At approximately 1947 hours, the UC got into his/her vehicle and left the

17  location.  SA Jackson and SA Clammer followed the UC back to the debrief location.  SA

18  Jackson took custody of the methamphetamine and the $125 in cash.

19      52.    The CI was still at the location with ROSARIO and his associates.

20  ROSARIO provided the CI with a sample of what ROSARIO called his new M-30's.  The

21  package came with two M-30 (suspected fentanyl) pills in it.

22      53.    At approximately 2006 hours, the CI drove away from the location and was

23  followed to the debrief location by SA Parker.

24      54.    SA Jackson took custody of the two M-30 pills that were provided to the CI

25  as a sample.  SA Jackson took custody of the transmitting/recording device that was placed

26

27

28  AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 11

1   on the CI. SA Jackson searched the CI's vehicle and the CI's person for contraband. There

2   was no contraband found in the CI's vehicle or on the CI's person.

3       55.    SA Jackson and SA Casel transported the two M-30 pills, one ounce of

4   methamphetamine and $125 in cash to ATF Seattle Field Division, where it was packaged

5   and processed per ATF policy. SA Casel witnessed SA Jackson package and weigh the

6   evidence. The two M-30 pills weighed 2.3 grams (with packaging). SA Jackson field-

7   tested the methamphetamine, which tested positive for methamphetamine. SA Jackson

8   weighed the methamphetamine at 28.4 grams (with packaging). SA Casel witnessed SA

9   Jackson place the money and narcotics into the ATF Seattle I Drug Safe to be preserved

10  until it was shipped to the DEA Laboratory.

11      56.    The UC's recordings and CI's recordings were placed onto compact discs

12  and placed into the Seattle I Evidence Vault. SA Jackson listened to the recordings, which

13  were consistent to the account given by the CI and UC.

**Controlled Purchase of a Firearm on June 15, 2020**

15      57.    On June 14, 2020, the UC contacted ROSARIO via 206-257-9287. The UC

16  set up a time to meet with ROSARIO in Tukwila the following day.

17      58.    On June 15, 2020, at approximately 1300 hours, ATF, DEA and HSI

18  personnel that were participating in the UC operation, held a briefing of the operation.

19  During the briefing, photographs of ROSARIO were shown to all participants.

20      59.    Following the briefing, all surveillance units set up in their assigned locations

21  in and around the WoodSpring Suites, located at 15637 W. Valley Highway in Tukwila.

22  Global Positioning System (GPS) was placing ROSARIO's phone in the area of that

23  location. Upon arrival of surveillance units at WoodSpring Suites, they observed

24  ROSARIO's white Cadillac Escalade bearing Washington license plate BQJ0871 and

25  ROSARIO's black Chevrolet Tahoe bearing Washington license plate BRU7532 parked in

26  the southwest portion of the parking lot. The vehicles were both unoccupied.

28  AFFIDAVIT OF SA ERIC JACKSON
    USAO No. 2020R00604 - 12

60.     At approximately 1543 hours, ROSARIO was observed walking out of WoodSpring Suites along with two other males. ROSARIO was carrying a backpack and another bag when he exited the hotel. ROSARIO walked to his Escalade, which was parked near the UC. ROSARIO got into the Escalade and moved it next to the UC's vehicle.

61.     The UC got out of his/her vehicle and started speaking to ROSARIO through the driver's window of the Escalade. The UC observed ROSARIO place his pistol (a firearm that appeared to be the same firearm the UC observed ROSARIO with on May 29, 2020) on the center console's cup holders and then put a small bag on top of it. ROSARIO and the UC discussed the firearms that ROSARIO had mentioned previously in texts. ROSARIO told the UC, in sum, that he was going to a place, later that day, where he was going to make a "Ghost AR", describing that it did not have numbers on it and that it was made from 80% lowers. ROSARIO offered the AR to the UC and the UC told ROSARIO he/she wanted to buy it. The UC asked ROSARIO about the Glock he mentioned in his text and ROSARIO showed it to the UC. The UC could see clearly that the serial number on the underside of the barrel had been scratched off. ROSARIO explained to the UC that he had another buyer for it who was going to pay $1,200. The UC indicated to ROSARIO that he/she wanted to buy it, but then ROSARIO stated he wanted to keep it.

62.     The UC then asked about the other gun. ROSARIO told the UC, in sum, that he paid roughly $800 for it, explaining he had given the guy a "roll of Xanax" pills for it to trade. ROSARIO later stated he shot the gun the night before, telling the UC, in sum, it was a nice gun. ROSARIO produced the pistol from his backpack and set it on the seat in front of the UC. ROSARIO told the UC he would take $800 for it. The UC handed ROSARIO $800 in cash and took the gun. ROSARIO handed the UC a black Crown Royal bag, which the UC placed the gun into and then placed the gun into his/her own vehicle.

AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

63.     The UC and ROSARIO continued to talk at ROSARIO'S vehicle.  While showing the UC a picture on his phone, ROSARIO took a call on speaker.  The individual who called him stated "I'm trying to pick up".  The caller asked, "do you have the $15 ones only? Or do you have the $10 ones again?"  ROSARIO told the individual, in sum, he had the $10 ones and to meet him at the South Center Mall.  The UC wrapped up his/her conversation with ROSARIO and the two agreed to talk later.

64.     SA Jackson and SA Clammer followed the UC back to the debrief location, where SA Jackson took custody of the firearm.  The firearm the UC purchased was a Kimber, Ultra Carry II, .45 caliber pistol bearing serial number KU135815.  The magazine was inserted into the magazine well and contained four .45 caliber cartridges.  There was not a round chambered.  The pistol was inside of a black Crown Royal bag.

65.     SA Jackson ran the firearm through NCIC and received a stolen hit from Kirkland Police Department (18-30956).  SA Jackson confirmed the firearm stolen through Norcom.

**Controlled Purchase of a Firearm on June 27, 2020**

66.     On June 17, 2020, investigators were able to affix a covert tracking device to ROSARIO's white Cadillac Escalade bearing Washington license plate BQJ0871.  The tracking device was affixed pursuant to a King County Superior Court Tracking Warrant.

67.     On June 27, 2020, through calls and texts with ROSARIO, the UC agreed to meet ROSARIO in SeaTac, Washington in the parking lot of Jack In The Box parking lot at the northwest corner of South 188th Street and Pacific Highway South.

68.     At approximately 1730 hours, the UC pulled into the Jack In The Box parking lot.  Once at the location, the UC sent ROSARIO a text message and then a call to ROSARIO at 206-257-9287 to let him know he/she was at the meet location.  After a short while, ROSARIO and a male passenger pulled into the Jack In The Box parking lot in ROSARIO's black Chevrolet Tahoe bearing Washington license plate BRU7532.

AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 ROSARIO asked the UC to follow him. The UC followed ROSARIO to the Hampton Inn
2 at 18850 28th Avenue South, where ROSARIO used a key card to open the underground
3 garage gate and the UC followed him in.

4     69.    The UC then got out of his/her vehicle and walked up to ROSARIO's vehicle.
5 ROSARIO opened the door and the UC observed him take a hit from a dark substance
6 melted onto an aluminum sheet that was on his lap, through a glass straw. (The UC
7 observed ROSARIO smoke either fentanyl pills or Xanax pills this way during the May
8 29, 2020 deal). The UC observed a male in the passenger seat open a bag, look inside it
9 and hand the bag to ROSARIO. ROSARIO pulled an Intratec 9mm pistol from the bag.

10     70.    ROSARIO racked the firearm and pulled the trigger several times, showing
11 the UC how to work the safety mechanism. ROSARIO explained he had shot the firearm,
12 but that its magazine had been stolen. ROSARIO told the UC, in sum, he was supposed to
13 sell it for $3,000. The UC then took the firearm and paid ROSARIO $1,500 in cash for it.

14     71.    The UC then followed ROSARIO out of the garage and they went their
15 separate ways. TFO Eshom followed the UC back to the debriefing location and took
16 custody of the firearm. The firearm was an Intratec, Model AB-10, 9mm pistol bearing
17 serial number A035114. The firearm was transported to the Seattle I Field Office and
18 placed into the Seattle I Evidence Vault.

19               **Controlled Purchase of a Firearm on July 21, 2020**

20     72.    On July 20, 2020, ROSARIO contacted the UC regarding selling him/her a
21 Mac-11 firearm. ROSARIO initially informed the UC; he wanted $800 for it. The UC
22 advised ROSARIO, if he held it for him/her for a day, would pay him $900 for it.

23     73.    On July 21, 2020 at approximately 1200 hours, ATF, DEA, and HSI
24 participants in the operation conducted a briefing of the operation. During the briefing,
25 photographs of ROSARIO and his associates/employees were shown.

26

27

28   AFFIDAVIT OF SA ERIC JACKSON
    USAO No. 2020R00604 - 15

74.     Following the briefing, all surveillance units set up in their assigned locations in and around the Commons Mall, located at 1928 South Commons, Federal Way, WA. At approximately 1402 hours, the UC arrived at the Commons Mall.  After waiting for a while, at approximately 1442 hours, the UC relocated to the MacDonald's at 2302 South 320th Street in Federal Way.

75.     At approximately 1557 hours, ROSARIO arrived at MacDonald's in his white Cadillac Escalade bearing Washington license plate BQJ0871.  There was an unidentified female in the front passenger seat.

76.     At approximately 1601 hours, the UC followed ROSARIO to a strip mall located at 32921 1st Avenue South in Federal Way.  ROSARIO then got into the UC's vehicle and they went to 144 SW 332nd Place Apartment 2804 in Federal Way.[1]

77.     ROSARIO took the UC into the apartment.  Inside were two Caucasian females appearing to the UC to be in their early 20's, one of which sat on the floor in front of a mirror applying makeup.  The other female was pacing in the main living area while talking on her phone.  ROSARIO then took the UC into a bedroom and closed the door. The UC observed stolen car stereo equipment and numerous baseball hats (which ROSARIO liked to wear) hung on the wall.  On the floor next to the bed, the UC observed the box, which ROSARIO used to carry his narcotics and money on previous deals with him.

78.     ROSARIO then retrieved a bag that had a lock on it that he opened. ROSARIO pulled the S.W.D/Cobray, M-11, 9mm pistol from the bag and handed it to the UC.  The UC paid ROSARIO $900 for the pistol and put it back in the bag.

79.     The UC left the apartment and was followed away by SA Jackson and TFO Eshom.  ROSARIO remained in the apartment once the UC left.  Once to the debrief

---

[1] This apartment unit is part of the Cove Apartments complex, located at 33131 1st Avenue South in Federal Way.

AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  location, SA Jackson took custody of the firearm, which was identified as a S.W.D/Cobray,

2  Model M-11, 9mm pistol/submachine gun bearing serial number 89-0066815.  ATF TFO

3  Paul Stanek ran the firearm through NCIC and did not receive a stolen hit.  The firearm

4  had the magazine inserted with 30 9mm cartridges in the magazine.  There were no

5  cartridges chambered.

6              **Investigation at the Ramada Inn and Suites on August 11, 2020**

7          80.    During the two-month period of investigating ROSARIO, he has not shown

8  to sleep in the same place for more than two to three days at a time consecutively.

9  Investigators has seen ROSARIO staying overnight at the following locations during the

10  period of this investigation:

11          a.  Hawthorn Suites, 6329 South 212th Street, Kent

12          b.  WoodSpring Suites, 15637 West Valley Highway, Tukwila

13
14          c.  Hampton Inn, 18850 28th Avenue South, SeaTac

15          d.  La Quinta Inn, 2824 South 188th Street, Seattle

16          e.  County Inn and Suites, 3100 South 192nd Street, Seattle

17
18          f.  Motel 6, 20651 Military Road South, Seattle

19          g.  The Cove Apartments, 33131 1st Avenue South, Apartment 2804, Federal

20              Way

21          h.  The Ramada Inn and Suites, 16720 International Boulevard, SeaTac,

22              Washington.

23
24          81.    SA Jackson obtained a federal arrest warrant for ROSARIO on August 10,

25  2020.

26

27

28  AFFIDAVIT OF SA ERIC JACKSON
    USAO No. 2020R00604 - 17

82.     On the morning of August 11, 2020, arrest and surveillance teams arrived at the Ramada Inn and Suites, located at 16720 International Boulevard, SeaTac, Washington. The arrest team contacted and secured ROSARIO's Cadillac Escalade, which was parked in the Ramada parking lot.

83.     When agents arrived, a female exited a gold Honda Civic with no front or rear license plate (**TARGET VEHICLE 3**) that was parked near the Cadillac.  Shortly after she exited the Honda Civic, ROSARIO exited the Ramada Inn and Suites, accompanied by four to five other individuals.  ROSARIO ran from arresting agents but was ultimately apprehended at a gas station few blocks away and taken into custody.  His associates were detained.

84.     Cierra Kastner, one of the people who accompanied ROSARIO out of the hotel, was carrying two bags.  She said that she grabbed the bags as they left the hotel, but the bags were not hers and she did not know what was inside of them.  The bags were a large black tote bag and a NorthFace backpack.  Agents noted that the tote bag was extremely heavy.

85.     Agents interviewed Ramada hotel staff.  A hotel manager stated that hotel staff had observed a group of individuals who appeared to be associated with one another, moving consistently between three particular rooms:  #121, #223, and #406.  Hotel staff had received complaints about Room #121 (**HOTEL ROOM 1**), specifically, noise complaints and complaints about a strong smell emanating from the room.  Earlier in the week, the hotel manager observed ROSARIO inside **HOTEL ROOM 1** and observed what she believed to be drug activity in the room.

86.     Hotel staff provided the following information about the room rentals.  Room #121 was rented to "Jennifer Kazmirski."  Room #223 was rented to "Jose Perez."  Room #406 was rented to "Laquana Green."  Agents were not familiar with any of these

AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  individuals, and the hotel staff did not have any additional information about them, such

2  as addresses or dates of birth.

3       87.    Hotel staff informed ATF agents that the group was associated with a white

4  Chevrolet Trailblazer, bearing Washington license plate #BFU4634, (**TARGET**

5  **VEHICLE 4**), which was also parked in the hotel parking lot.

6       88.    Agents contacted an individual, Devaera Proctor, who was detained in

7  ROSARIO's Escalade shortly before ROSARIO's arrest. Mr. Proctor stated that he had

8  just left Room #223 (**HOTEL ROOM 2**), and that ROSARIO was in HOTEL ROOM 2

9  when he left.

10      89.    Drug Enforcement Administration (DEA) Task Force Officer Natalie

11  Mounts assisted the investigation with her K-9, Ginger. A copy of the K-9 Ginger's

12  experience, training, and certifications is attached as Appendix A and incorporated by

13  reference as if set out fully herein.

14      90.    TFO Mounts led K-9 Ginger through the hotel. K-9 Ginger alerted on rooms

15  #121 and #223 (**HOTEL ROOMS 1 and 2**), but not room #406.

16      91.    K-9 Ginger alerted on the tote bag and the NorthFace backpack that Cierra

17  Kastner carried out of the hotel, accompanied by ROSARIO.

18      92.    K-9 Ginger alerted on **TARGET VEHICLES 3 and 4.**

19              **COMMON CHARACTERISTICS OF DRUG TRAFFICKERS**

20      93.    As a result of my training and experience, and based on my consultation with

21  other agents and law enforcement officers, I have an understanding of the manner in which

22  narcotics are distributed and the various roles played by individuals and groups in their

23  distribution. I have encountered and have become familiar with various tools, methods,

24  trends, paraphernalia, and related articles utilized by various traffickers in their efforts to

25  import, conceal, and distribute controlled substances. I am also familiar with the manner

26

27

28  AFFIDAVIT OF SA ERIC JACKSON
     USAO No. 2020R00604 - 19

in which drug traffickers use telephones, often cellular telephones, to conduct their unlawful operations. I am also familiar with the manner in which drug traffickers will use weapons to protect their drug activities and further its goals.

94.     Based upon my training, experience, and conversations with other experienced officers and agents, I know that:

a.     Drug trafficking conspiracies usually take place over several months or years, and continue to operate even when enforcement activity results in arrests and/or seizures of drugs and/or money.

b.     Persons involved in the distribution of controlled substances typically will obtain and distribute drugs on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug dealers will maintain an "inventory," which will fluctuate in size depending upon the demand for and the available supply of the product.

c.     It is common for drug dealers to possess narcotics, drug paraphernalia, and other items which are associated with the sale and use of controlled substances such as scales, containers, cutting agents/substances, and packaging materials in their residences, stash houses, storage units, garages, outbuildings and/or vehicles on their property.

d.     Drug traffickers often document aspects of their criminal conduct through photographs or videos of themselves, their associates, their property, and their product. Drug traffickers usually maintain these photographs or videos in their possession.

e.     It is a common practice for drug traffickers to maintain records relating to their drug trafficking activities in their residences, stash houses, storage units, garages, outbuildings and/or vehicles. Because drug traffickers in many instances will "front" (i.e., sell on consignment) controlled substances to their

AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 20

clients, or alternatively, will be "fronted" these items from their suppliers, such record keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. These records include "pay and owe" records to show balances due for drugs sold in the past (pay) and for payments expected (owe) as to the trafficker's suppliers and distributors, telephone and address listings of clients and suppliers, and records of drug proceeds. These records are commonly kept for an extended period of time.

f.      Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation and distribution of controlled substances. These documents, whether in physical or electronic form, are maintained where the traffickers have ready access to them. These documents include travel records, receipts, airline tickets, auto rental agreements, invoices, and other memorandum disclosing acquisition of assets and personal or business expenses. I also know that such records are frequently maintained in narcotics traffickers' residences, stash houses, storage units, garages, outbuildings and/or vehicles.

g.      Drug traffickers often maintain large amounts of US currency in order to maintain and finance their ongoing illegal drug trafficking business.

h.      It is common for drug dealers to secret drugs, currency and other valuable items representing the proceeds of drug sales in secure locations within their residences, stash houses, storage units, garages, outbuildings and/or vehicles on the property in order to prevent the theft of such items by other persons or the seizure of such items by law enforcement. These secure locations typically include other residences also known as "stash houses," storage lockers, safes, portable safes, vaults, or other locked containers (sometimes requiring passwords or codes to open),

AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    as well as specially constructed concealed compartments such as those often found

2    in "load cars" used specifically to facilitate drug trafficking.

3          i.      It is common to find papers, letters, billings, documents, and other

4    writings, which show ownership, dominion, and control of businesses, residences,

5    and/or vehicles in the residences, stash houses, storage units, garages, outbuildings

6    and/or vehicles of drug traffickers. Items of personal property that tend to identify

7    the person(s) in residence, occupancy, control, or ownership of the premises also

8    include canceled mail, deeds, leases, rental agreements, photographs, personal

9    telephone books, diaries, utility and telephone bills, statements, identification

10   documents, keys, financial papers, rental receipts and property ownership papers,

11   personal and business telephone and address books and telephone toll records, and

12   other personal papers or identification cards in the names of subjects involved in the

13   criminal activity being investigated.

14         j.      Drug traffickers commonly have in their possession, that is, on their

15   person, at their residences, stash houses, storage units, garages, outbuildings and/or

16   vehicles, firearms, ammunition, and other weapons, which are used to protect and

17   secure their property. Persons who purchase and possess firearms also tend to

18   maintain the firearms and ammunition for lengthy periods of time. Firearms can be

19   acquired both legally and unlawfully, without official / traceable documentation.

20   Persons who acquire firearms from Federal Firearms Licensees, through deliberated

21   fraud and concealment, often will also acquire firearms from private parties and

22   other sources unknown to ATF. Firearms or ammunition are often secreted at other

23   locations within their residential curtilage, and the identification of these firearms

24   will assist in establishing their origins. Persons who purchase, possess, sell and/or

25   trade firearms or ammunition commonly maintain documents and items that are

26   related to the purchase, ownership, possession, sale and/or transfer of firearms,

27

28   AFFIDAVIT OF SA ERIC JACKSON
    USAO No. 2020R00604 - 22

1   ammunition, and/or firearm parts, including but not limited to driver's licenses,

2   telephone records, telephone bills, address and telephone books, canceled checks,

3   receipts, bank records and other financial documentation on the owner's person, at

4   the owner's residence, or in vehicles that they own, use, or have access to.

5        k.    Drug traffickers use mobile electronic devices including cellular

6   telephones and other wireless communication devices in connection with their

7   illegal activities in order to set up meetings with coconspirators, conduct drug

8   transactions, or to arrange for the transportation drugs or drug proceeds. As

9   described below, such equipment often contains evidence of these illegal activities.

10        l.    Traffickers of controlled substances commonly maintain addresses,

11   vehicles, or telephone numbers which reflect names, addresses, vehicles, and/or

12   telephone numbers of their suppliers, customers, and associates in the trafficking

13   organization, and it is common to find drug traffickers keeping records of said

14   associates in cellular telephones and other electronic devices. Traffickers often

15   maintain cellular telephones for ready access to their clientele and to maintain their

16   ongoing narcotics business. Traffickers frequently change their cellular telephone

17   numbers to avoid detection by law enforcement, and it is common for traffickers to

18   use more than one cellular telephone at any one time.

19        m.    Drug dealers use cellular telephones as a tool or instrumentality in

20   committing their criminal activity. They use them to maintain contact with their

21   suppliers, distributors, and customers. They prefer cellular telephones because, first,

22   they can be purchased without the location and personal information that land lines

23   require. Second, they can be easily carried to permit the user maximum flexibility

24   in meeting associates, avoiding police surveillance, and traveling to obtain or

25   distribute drugs. Third, they can be passed between members of a drug conspiracy

26   to allow substitution when one member leaves the area temporarily. Since cellular

27

28   AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 23

phone use became widespread, many drug dealers I have contacted have used one or more cellular telephones for his or her drug business. I also know that it is common for drug traffickers to retain in their possession phones that they previously used, but have discontinued actively using, for their drug trafficking business. Based on my training and experience, the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or crimes. This includes the following:

i.   The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone. This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package, and to confirm if the telephone was contacted by a cooperating source.

ii.  The stored list of recent received, missed, and sent calls is important evidence. It identifies telephones recently in contact with the telephone user. This is valuable information in a drug investigation because it will identify telephones used by other members of the organization, such as suppliers, distributors and customers, and it confirms the date and time of contacts. If the user is under surveillance, it identifies what number he called during or around the time of a drug transaction or surveilled meeting. Even if a contact

AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 24

1  involves a telephone user not part of the conspiracy, the information

2  is helpful (and thus is evidence) because it leads to friends and

3  associates of the user who can identify the user, help locate the user,

4  and provide information about the user. Identifying a defendant's law-

5  abiding friends is often just as useful as identifying his drug-

6  trafficking associates. The information is also valuable in the firearms

7  context because it will identify telephones used by other individuals

8  who are part of illegal firearms transactions, and confirm the date and

9  time of contacts.

10  iii.  Stored text messages are important evidence, similar to stored

11  numbers. Agents can identify both drug associates, and friends of the

12  user who likely have helpful information about the user, his location,

13  and his activities.

14  iv.  Photographs on a cellular telephone are evidence because they help

15  identify the user, either through his or her own picture, or through

16  pictures of friends, family, and associates that can identify the user.

17  Pictures also identify associates likely to be members of the drug

18  trafficking organization. Some drug dealers photograph groups of

19  associates, sometimes posing with weapons and showing identifiable

20  gang signs. Also, digital photos often have embedded "geocode" or

21  GPS information embedded in them. Geocode information is typically

22  the longitude and latitude where the photo was taken. Showing where

23  the photo was taken can have evidentiary value. This location

24  information is helpful because, for example, it can show where

25  coconspirators meet, where they travel, and where assets might be

26  located.

27

28  AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 25

v.  Based on my training and experience in investigating numerous firearms possession and trafficking offenses, I am aware that when individuals who are prohibited from legally possessing firearms seek to acquire firearms, they typically seek to obtain the firearms from private sellers. A common way in which these types of private firearm sales, also referred to as "street sales," are transacted is via electronic communications such as text message, email, and/or telephone calls. I know that cell phones are frequently used to arrange such transactions because of the flexibility and mobility they offer. I am further aware that when individuals are offering items of value for sale, such as firearms, it is common for them to take a photograph of the item and send it via text message or email to an interested party for their review, or to take a photograph of it to post/advertise it via social media or the internet. During numerous investigations of firearms sales, I have found it to be common for buyer's or seller's cell phones to contain photographs of the firearms that were bought or sold.

vi.  Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects.

## CONCLUSION

95.  Based on the foregoing, I respectfully submit that there is probable cause to search Ramada Inn and Suites hotel rooms #121 and #223, TARGET VEHICLES 3 and 4, and two bags, all further described in Attachment A, for evidence, fruits, and instrumentalities of distribution and possession with intent to distribute controlled

AFFIDAVIT OF SA ERIC JACKSON
USAO No. 2020R00604 - 26

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  substances and conspiracy to do the same, in violation of Title 21, United States Code,

2  Sections 841(a)(1) and 846, and possession of a firearm in furtherance of a drug trafficking

3  crime, in violation of Title 18, United States Code, Section 924(c), as further described in

4  Attachment B.

5

6

7                                    ERIC JACKSON, Special Agent

8                                    Alcohol, Tobacco, Firearms, and
                                     Explosives (ATF)
9

10        The above-named agent provided a sworn statement attesting to the truth of the

11  foregoing affidavit on the 11th day of August, 2020.

12

13

14

15

16                                   MARY ALICE THEILER
                                     United States Magistrate Judge
17

18

19

20

21

22

23

24

25

26

27

28  AFFIDAVIT OF SA ERIC JACKSON
    USAO No. 2020R00604 - 27

# APPENDIX A

## Narcotics Detection K9 Team
## Detective Mounts and K9 Ginger

### Team Pedigree

K9 Ginger and I, Detective Mounts, are currently certified as a Narcotics Detection
Canine Team under Washington Administrative Code (WAC) 139.05.915. We were
originally certified together under this WAC on November 10, 2018 after 292.5 hours of
initial training.  We re-certified on September 17th, 2019.  K9 Ginger is trained to alert on
the odor of cocaine, crack cocaine, methamphetamine, heroin, and marijuana.  K9 Ginger
is a passive alert canine, which means she gives a sit response after locating the source
area where the odor of narcotics is emitting.  This sit response is accepted by current
narcotics detection canine standards.  The handler is trained to watch for changes of
behavior (alert) the canine exhibits when an odor of narcotics is detected.  Ginger's
reward is a ball.

In February of 2012 I was commissioned as a Police Officer with Auburn Police
Department.  In November 2015 I was assigned as a Detective to the Special
Investigations Unit (SIU).  In October 2017 I was assigned as a Task Force Officer (TFO)
with the Drug Enforcement Administration (DEA) group D-22, the Valley Narcotics
Enforcement Team (VNET).  In September 2018 I attended the Washington State Patrol
(WSP) Narcotics Detection Canine program and during training was assigned K9 Ginger.

Our continued training includes monthly training sessions with certified narcotics K9
trainers as well as training on my own.  Ginger is trained in various scenarios including
vehicles of all types to include semi-trucks, open area searches, warehouses, residences, and
other types of buildings.  Ginger is also trained in interdiction such as parcel and airport
interdiction scenarios.  Ginger has been trained on small and large finds, from grams to
multiple pounds.  Ginger is regularly exposed to various types of distractions such as food,
packaging, toys, and other dogs in order to practice concentration on the task at hand.
Additionally, she is trained in "blank" situations where there are no narcotic odors to be
found.

Since our initial certification in November 2018, Ginger has successfully located and
assisted in the seizure of more than 20 pounds of heroin, 191 pounds of methamphetamine,
2100 pounds of marijuana, and around half a pound of cocaine.  She has also assisted with
the seizure of over $2,000,000 drug money.

### K9 Application

On 08/11/20 I was assisting the Bureau of Alcohol, Tobacco, and Firearms (ATF) and Drug
Enforcement Administration (DEA) group D-22.  We were following a Cadillac Escalade
known to be associated with a subject under investigation.  Around 0830 hours the Escalade
was located at Ramada Inn, 16720 International Blvd, Seatac WA.  The vehicle was
followed away from then back to the Ramada Inn, at which point agents moved in and
detained four subjects from the inside of the vehicle.

A female had been sitting nearby in a gold Honda; as agents detained the subjects from the Escalade, the female exited the Honda and walked away.  An Agent observed that female enter the front lobby of the Ramada Inn, then exit with three additional subjects and leave the area on foot southbound.  Agents discovered the four subjects leaving southbound were associated with the Escalade.  All four were contacted.  One female was in possession of a purse and a blue backpack.  The purse and backpack were placed on a retaining wall, about four feet away from one another.  I deployed K9 Ginger along the wall and observed Ginger alert at the purse then at the backpack.  For both alerts she gave a sit indication.

I went to the Ramada Inn where the four subjects from the Escalade were detained.  One of them said he would take us to the room he'd been staying in; he showed us to room 223.  I deployed Ginger in the hallway, starting near door 222 and moving along the wall to 223.  I observed Ginger alert at the door handle of room 223, then presented the bottom door seam and saw her alert then sit after sniffing the door seam.  We continued to door 224; Ginger did not alert.  I returned to door 223 and presented the door handle; Ginger sniffed it then gave a sit indication.

Management was contacted about the occupants of room 223.  They said rooms 121 and 406 were associated with room 223.  I went to room 121 and deployed the dog, starting three doors to the left of it at room 118.  I presented the door seams of rooms 118 and 119 then continued along the wall to room 120 then room 121.  Ginger alerted and gave a sit indication at the bottom door seam of room 121.

I went to room 406.  It was situated on a wall by itself, just around the corner from a dead end hallway containing three additional doors.  I deployed Ginger along the wall before room 406, then along the door seam of room 406, then past it to the next room.  Ginger did not show any alert behavior.

I went outside and was advised Agents learned two additional vehicles in the parking lot were associated with the Escalade and its occupants.  A white Chevy Trailblazer, which was parked right next to the Escalade, and the gold Honda the earlier female had exited before leaving on foot.  I deployed Ginger around the gold Honda, starting at the front driver's side bumper.  I observed Ginger alert and give a sit indication at the seam between the front and rear driver's side doors.  I continued around the vehicle and saw Ginger alert at the front passenger window, which was open about half way.

I deployed Ginger around the white Trailblazer, starting at the front passenger side bumper.  I observed Ginger alert at the driver's door handle and again at the seam between the front and rear passenger side doors.

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.  Signed this 11th day of August, 2020 at Seatac, WA.

/s/ Natalie Mounts